MOLLIE J. COURTNEY, *ex'rix., et al. v.* JOSEPH PURSGLOVE, *et al.*

(No. 6978)

Submitted September 29, 1931.    Decided October 6, 1931.

*Taplin & Fillius, Frank P. Weaver,* and *H. H. Hoppe,* for appellant.

*Cox & Cox* and *Lazzele & Lazzelle,* for appellees.

MAXWELL, JUDGE:

In this suit, plaintiffs seek collection of the final rental installment under a written instrument dated August 7, 1920, which the parties thereto denominated a lease and which purported to lease to Joseph Pursglove the Pittsburgh and Sewickley seams of coal under several tracts of land. The Pursglove Coal and Mining Company is the present owner by assignment of the rights under the instrument of Joseph Pursglove. The Pursglove Company paid into court all of the sum claimed except $5,464.50, which it contends should be abated, because of an alleged shortage in the coal acreage of one of the tracts identified as *5-D*. The trial chancellor entered judgment for plaintiffs for the above amount, and the company appeals.

The instrument provided that a royalty of 25c per net ton should be paid as rental for the coal; that each acre should be deemed to have 12,000 tons in the Pittsburgh seam, and

6,000 in the Sewickley, and payment should be made accordingly, whether the acre "contains that amount or not, or whether the lessee mines therefrom that amount or not." The actual coal acreage was to be determined by a survey to be made by the lessors (which was made in November, 1920, and a plat thereof delivered to the lessee, and the plat and lease then recorded together). The total consideration was based on the coal acreage as ascertained by the survey. After a one-tenth down payment (completed after the finishing of the survey), the balance was to be paid in nine equal annual installments.

By the survey, which was run to the outcrop of the coal and was accepted by the lessee, tract 5-D, containing 40 acres superficially, was stated to contain 32 acres of coal. Defendants mined about 28 acres of this tract, and assert there is no more coal there. The area thus asserted to contain no coal lies between the face of the operation in the coal stratum and the outcrop of the stratum at the surface on the side of the hill which overlies the coal.

The following concise and comprehensive summary of the evidence is taken from the trial chancellor's opinion:

"Witnesses for defendants, engineers and Samuel Pursglove, manager in charge of operations of the defendant company, testify that when they reached certain points along a line which they have fixed in their maps as the extent of the good coal, that they ran into what they term muck, that it consisted of black or gray shaley substance, which they admit may have some coal in it, but which was not in fact coal. They have laid down on their maps a line from certain points of entry into this area between which line and the surveyed outcrop line of the Sewickley coal, this three and a fraction acres in which they claim there is no coal is claimed to be. Their witness Brumbaugh further testifies that he made two diggings a short distance in from the surveyed outcrop line and obtained therefrom samples, which he had filed and which the Court has examined, and which he claims further show the character of the substances in the contested area.

"Defendants put on the stand, Witness Hill, who is not now employed by the defendant company, but who was a former

employee thereof in its surveying staff, and who, by the way; seems to be a most intelligent witness, who testified as follows: 'The coal somewhat back of the limitations of this map was somewhat discolored and loose in texture (he evidently intended that part of the coal which is considered mineable by defendant). However, this somewhat inferior coal was to some extent mined. This I ascertained by repeated trips to the working faces in this section of the mine. However, when the coal in this section of the mine became so crumbly, red and mixed with dirt, it was deemed best with those conditions there, that it was impossible to consider it as coal mining operations in these faces, we brought it to a close.'

"Plaintiff in reply to the cross defendant's testimony, did not put on the stand any experts or mining men. Judge Lazzelle and Lee Stump, however, testified they went out personally and dug down in the two places where Witness Brumbaugh got his samples. They testified that at the top of the coal in one of those places they found conditions about as Brumbaugh stated, but that they dug on down about two feet or two feet and a half and there got real coal, a sample of which they brought in and filed it and the Court has seen and inspected it. In one sack they have one large lump of coal, probably six by eight inches, and in another sack they have smaller lumps, but it is unquestionably coal. They testified that at the other location where Brumbaugh dug, they found no coal at all and that they are of the opinion that the digging at that point was not at the proper place."

It is also to be noted that the opinion expressed by one of plaintiffs' witnesses that the great portion of the Sewickley stratum in the questioned area has a covering 15 to 20 feet in thickness is not challenged. (Coal near the outcrop is apt to be better under heavy covering such as that just mentioned than under light covering.)

The contract of sale and purchase did not provide for the measuring of the acreage of the coal from a line to be run a given number of feet back of the outcrop, or at a point where the covering should be of a certain thickness. The contract was *for all of the Sewickley coal*. Neither thickness nor quality of the coal was mentioned, nor was outcrop coal ex-

cluded. The pertinent provision of the contract "that the lessee shall pay for 6,000 net tons for each acre of said Sewickley or Mapletown vein of coal covered by this lease whether such acre contains that amount or not, or whether the lessee mines therefrom that amount or not" is so clear and unequivocal that attempted interpretation would be vain. It merely means what it says.

It is said on behalf of the mining company: "The lessee assumed the risk that went with the quantity of coal per acre and the difficulties and expense of carrying on mining operations, but the lessee did not assume the risk of there being no coal whatever within the areas covered by the survey made by the lessors, as to which the lessors represented that coal existed." If this be the correct diagnosis the company is not helped thereby because by its contract it purchased the coal to the outcrop and assumed the risk of the quality and thickness of the coal in or near the outcrop, just as it assumed such risk as to the body of the coal. The evidence discloses that there was a thirty-six to forty inch face to the stratum when the operation thereof was terminated. As to what is between that face and the point on the hillside where the stratum ends is largely conjecture.

The Pursglove Company's claim for abatement is predicated on the allegation in its cross-bill-answer that there was a mistake to the extent of 3.643 acres in the survey of the Sewickley coal in tract 5-D, and that such mistake was not discovered until long after the survey had been made and accepted. (Mutuality of mistake is not averred.) Correction of the alleged ·mistake is prayed. While courts of equity have power to correct mutual mistakes in-written instruments of legal import, the exercise of such power must be predicated on evidence that is clear and convincing. *Melott* v. *West,* 76 W. Va. 739; *Blue* v. *Blue,* 92 W. Va. 574. That requirement of proof has not been met here.

We affirm the trial chancellor.

*Affirmed.*